971 P.2d 1104

**SAM TEAGUE, LTD., dba Page Hawaii and Sam Teague, Appellants–Appellants,**

v.

**HAWAI'I CIVIL RIGHTS COMMISSION, Amefil Agbayani, Jack Law, Richart Port, and Daphne Barbee–Wooten, all in their official capacities as Commissioners of the Hawaii Civil Rights Commission, Yvette Shaw, and Linda C. Tseu in her official capacity as Executive Director of the Hawaii Civil Rights Commission, Appellees–Appellees**

No. 19691.

Supreme Court of Hawai'i.

Feb. 3, 1999.

Dennis W. King (William J. Deeley with him on the brief) on the briefs, Honolulu, for Appellants–Appellants Sam Teague, Ltd., dba Page Hawaii, and Sam Teague.

John Ishihara, on the briefs, Honolulu, for Appellees-Appellees Hawai'i Civil Rights Commission, Amefil Agbayani, Jack Law, Richard Port, Daphne Barbee–Wooten, and Linda C. Tseu.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

In this employment discrimination case, appellants-appellants Sam Teague, Ltd., d.b.a. Page Hawaii, and Sam Teague (collectively, "Employer") appeal from the circuit court's final judgment and order affirming the final decision of appellee-appellee Hawai'i Civil Rights Commission (the Commission), filed February 7, 1996. The Commission concluded in its final decision that Employer discriminated against appellee-appellee Yvette Shaw because of her sex (pregnancy and childbirth) in violation of Hawai'i Revised Statutes (HRS) § 378–2(1)(A) (1993) and Hawai'i Administrative Rules (HAR) §§ 12–46–106, 12–46–107 and 12–46–108 (1993). The Commission awarded Shaw $16,500 in back pay, $20,000 in compensatory damages, and $5,000 in emotional distress damages.

On appeal, Employer contends that the circuit court erred by affirming the Commission's final decision because: (1) Shaw's amended complaint was untimely filed violating the statute of limitations in HRS § 368–11 (1993); (2) Employer's policy prohibiting any type of extended leave for one year did not have a disparate impact on women; (3) the termination of Shaw's employment was a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the business; and (4) the back pay awarded to Shaw should have been offset by the unemployment insurance benefits she received. For the reasons set forth below, we disagree with all of Employer's contentions and affirm the circuit court's order and judgment.

## I. BACKGROUND

Employer is a two-person business run by its president and sole stockholder, Sam Teague, and an office manager. The business sells and rents pagers and provides paging services. The essential job functions of the office manager include: (1) general office duties, such as opening and closing the office, billing, filing, opening and closing customer accounts, receiving cash amounts under $1,000, giving change, preparing deposits, and collecting overdue accounts; (2) demonstrating and selling the various pagers, equipment, and services provided by the company; (3) programming and testing the pagers; (4) responding to customer complaints about pagers or billing; and (5) general inventory, maintenance, and cosmetic repair of pagers. Typically, a new office manager would require about six to nine months to learn and become competent in these functions.

Employer trained each of the office managers to perform the above-mentioned job functions. During the first six to eight weeks of training, Employer would not leave the office manager unsupervised. After the initial training period, Employer would leave the office manager unsupervised for approximately 1–3 hours per day.

From 1988 to the time of this appeal, Employer has instituted a "no leave" policy for its employees. Under this policy, no "extended" leave would be granted in an employee's first year of employment for any reason. Since December 1990, Employer has also had a policy of requiring a "one year commitment" from all office manager appli-

cants. Under Employer's interpretation of this commitment, a new office manager needed to work for twelve consecutive months without any extended leave.

On January 29, 1992, Jackie Gonzalez Rivera, a former office manager, interviewed Shaw for the office manager position. At this interview, Rivera informed Shaw of the Employer's requirement of a one-year commitment and asked Shaw whether she could make such a commitment. Rivera did not inform Shaw about the company's "no leave" policy and did not explain that the one-year commitment meant working twelve consecutive months without taking any extended leave.

At the time of the interview, Shaw thought that the one-year commitment simply meant being employed with Employer for twelve months. Shaw assumed that leaves of absences for disability, pregnancy, or other emergency purposes were allowed. Based on this understanding, Shaw told Rivera that her husband was stationed in Hawai'i until 1995 and that she would have no problem working for Employer for at least one year. Shaw intended to work for Employer until her husband was transferred out of Hawai'i.

Thereafter, Employer interviewed and asked Shaw whether she could make a one-year continuous commitment to the job. Like Rivera, Employer failed to inform Shaw of the company's "no extended leave" policy and failed to explain that a one-year commitment would be interpreted as working twelve consecutive months with no extended leave. At this interview, Shaw reaffirmed that a one-year commitment would not be a problem.

On January 30, 1992, Shaw underwent a pregnancy test at Tripler Army Medical Hospital. The test results reflected that Shaw was pregnant. On the following day, Employer offered Shaw the office manager position, and Shaw accepted the offer.

Shaw's three-month job performance review was scheduled for May 11, 1992 and then rescheduled to May 12, 1992. Because Shaw was afraid that her pregnancy would be a factor in her review, Shaw decided to inform Teague about her pregnancy after her review.

After receiving a satisfactory review, Shaw informed Employer that she was pregnant and was expecting to deliver in September. Shaw requested a six-week maternity leave. Shocked and angry, Employer expressed to Shaw that her request constituted a breach of her agreement to work for one continuous year. Shaw replied that she was not breaking her one-year commitment and that she planned to return to work for Employer after taking maternity leave. Shaw suggested the following options to Employer: (1) a temporary worker could be hired; (2) Shaw could shorten her leave to four weeks; or (3) Shaw could work part-time during the six-week period. In response, Employer stated that a temporary worker would be unacceptable [1] and rejected Shaw's other suggestions. Thereafter, Employer decided to end the discussion and told Shaw to "go home and sleep on it." The following day, Shaw again spoke to Employer about her request for maternity leave and explained that she and her husband were not planning to start a family but that "it happened." Employer again stated that it would not work out and that Shaw and her husband "should have used precautions."

Based on these discussions, Employer felt that he had made it clear that he was not going to grant Shaw's request for maternity leave. Shaw, however, felt the issue of her maternity leave was not resolved. Because Employer thought that Shaw was agitated and upset during the May 12 and May 13 discussions, Employer did not want to upset her again and thereafter spoke to her only about business matters.

1. An official of Select Temporary Services, Inc. (Select), a company which provides temporary workers to businesses, testified before the hearings officer with regard to providing a temporary worker to replace Shaw. Select has never had any employees with experience in selling, programming, or otherwise working with pagers. However, Select has employees with experiences similar to Shaw's work experience and has employees with office management, sales, and customer relations experiences. According to a representative of Select, these employees, if supervised, were capable of learning how to sell, program, and maintain pagers and could handle cash amounts up to $10,000.

Shaw's maternity leave was not discussed again until sometime in August 1992 when Employer and Shaw determined the date of Shaw's last day of work before giving birth. Shaw and Employer agreed that September 18, 1992 would be Shaw's last day. By that time, Shaw had mastered seventy-five to eighty percent of the office manager duties. Shaw gave birth on September 14, 1992. Although Shaw did not ask her doctor about the length of her maternity leave, Shaw's doctor would have recommended a six-week maternity leave period.

On September 16, 1992, Shaw phoned Employer with information that she had a daughter. Employer congratulated Shaw and told her that he was lucky to find a replacement for her. From this conversation, Shaw thought Employer had found a temporary replacement.

On September 18, 1992, Employer wrote to Shaw stating, "It will not be possible to hold open your job. The learning curve for the job is simply too great." In addition, Employer enclosed Shaw's final paycheck and a letter of reference. It is undisputed that Employer did not terminate Shaw because of poor work performance or tardiness.

Surprised and upset by Employer's September 18, 1992 letter, Shaw called Employer and asked how she could be terminated even though it was known that she wanted to return to her job. Employer stated that it had already hired a permanent replacement and could not hold the position open. Employer further stated that, as a small business owner, it could refuse to hold her position open.

Sometime in late August or early September 1992, Employer interviewed Susan Funari and offered her the office manager position. Funari began working with Employer on September 15, 1992. Sometime in the beginning of October 1992, Funari informed Employer that she was frustrated with the position and wanted to resign. Funari's last day of work was on October 23, 1992.

Thereafter, Employer began its search for a new office manager. Employer did not contact Shaw to let her know the office manager position was available. Employer even-

tually hired Marnie Wolfert to replace Funari. Wolfert reported for her first day of work on October 26, 1992.

Six weeks after giving birth, on October 23, 1992, Shaw was cleared to return to work. Later that day, Shaw wrote to Employer, asking to be reinstated to the office manager position on November 2, 1992. Employer responded by stating that there had been a "misunderstanding" and reiterated that it would not be possible to hold her position open or hire temporary help.

Shaw remained unemployed from October 23, 1992 to September 1993. During this period, Shaw applied for various administrative, sales, advertising, and clerical jobs. On the advice of his lawyer, Employer offered Shaw the office manager position after Wolfert vacated her position with Employer on November 23, 1993. Shaw declined the offer because she was again pregnant and believed that Employer would again deny her maternity leave. Employer operated the business by himself for a period of four weeks.

Shaw filed her claim against Employer on December 17, 1992, and later amended her claim on September 9, 1993. On July 13, 1994, Employer filed a motion to dismiss the amended claim contending that it was untimely filed. The Commission denied this motion.

After a contested case hearing before a hearings examiner, the hearings examiner found that Employer engaged in discriminatory practices by refusing to grant Shaw maternity leave and failing to reinstate Shaw. The hearings officer further awarded Shaw $3,800 in back pay and $20,000 for emotional injuries. Both parties appealed this decision.

On March 3, 1995, the Commission affirmed the hearings officer's findings and conclusions. However, the Commission increased the back pay award to $16,500, because it found that Shaw had attempted to mitigate her damages by applying to another company in the pager business and other telecommunications companies. From the Commission's decision, Employer appealed to the circuit court.

The circuit court affirmed the Commission's final decision. The circuit court fur-

ther found that Teague had a bias against pregnancy, females (who either were or might become pregnant), or against women raising young children. In support of this finding, the court cited the following statements made by Employer:

a) Pregnancy was a "self-induced illness,"

b) Ms. Shaw should have used "precautions" so she wouldn't become pregnant,

c) He felt that the business had been inconvenienced by employees with young children,

d) He had problems with a previous office manager who needed time off to care for a young child,

e) His reason for not wanting to reinstate Ms. Shaw was because of the potential problems she would face raising a young child,

f) He would not have hired Ms. Shaw if he had known that she was pregnant, and

g) He wouldn't hire a woman with a young child[.]

From the circuit court's decision, Employer timely appealed to this court.

## II. STANDARD OF REVIEW

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

HRS § 91–14(g) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6).

*Konno v. County of Hawai'i,* 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997) (citations and internal quotation marks omitted).

## III. DISCUSSION

### A. Timeliness of Amended Complaint

Employer first argues that the amended complaint filed September 9, 1993, which added Teague as a party in his personal capacity, was untimely filed. Employer maintains that, under HRS § 368–11(c), the statute of limitations expired four months prior to the filing of the amended complaint. We disagree.

HRS § 368–11 (1993) sets forth the applicable statute of limitations period and provides in relevant part:

(a).... Any individual claiming to be aggrieved by an alleged unlawful discriminatory practice may file with the commission's executive director a complaint in writing that shall state the name and address of the person or party alleged to have committed the unlawful discriminatory practice complained of, set forth the particulars thereof, and contain other information as may be required by the commission. The attorney general, or the

commission upon its own initiative may, in like manner, make and file a complaint.

. . . .

(c) No complaint shall be filed after the expiration of one hundred eighty days after the date:

(1) Upon which the alleged unlawful discriminatory practice occurred; or

(2) Of the last occurrence in a pattern of ongoing discriminatory practice.

Based upon the plain language of HRS § 368–11, Shaw needed to file her complaint alleging unlawful discrimination within 180 days after either the occurrence of the alleged discriminatory practice or the last occurrence in a pattern of ongoing discriminatory practice.

█ HAR § 12–46–6.1 (1992) specifically allows the amendment of a complaint to add new parties.[2] HAR § 12–46–6.1 provides in relevant part:

(a) Prior to the commencement of proceedings before the hearings examiner, the executive director may permit the parties, including the Attorney General and executive director, to amend documents filed with the Commission, including a complaint or responsive statement. After commencement of proceedings, amendments may be granted by the hearings examiner.

(b) *An amendment may be made:*

(1) To cure technical defects or omissions; or

(2) To clarify or amplify allegations, to add new causes of action or defenses, or *add new parties.*

(c) *Amendments shall relate back to the original filing date of the document.*

(Emphases added.) The Commission adopted HAR § 12–46–6.1 as an administrative rule pursuant to HRS § 368–3(9) (1993), which authorizes the Commission to adopt rules.[3] Based on the language of HAR § 12–46–6.1, Shaw, the attorney general, or the executive director of the Commission could have amended the complaint in this case to add a new party. This amendment would have related back to the original filing date of the complaint.

█ In this case, Shaw filed the original complaint against Employer on December 17, 1992, after her offer to return to work was rejected. Employer rejected Shaw's offer to return to work on October 26, 1992, at which time Employer informed Shaw that a permanent replacement for her had been hired. Because this complaint was filed within 180 days of Employer's refusal to reinstate Shaw to her original position, the original complaint was timely filed.[4]

Employer argues that the hearing officer's decision to allow the amendment of the complaint was arbitrary. Although HAR § 12–46–6.1 does not specifically require a reason in order to amend a complaint, the Commission added Teague to the complaint as an individual when it was discovered that Teague was the individual responsible for the alleged discriminatory conduct. The Commission noted that there may have been some confusion in this case because the business was called "Sam Teague, Inc., d.b.a. Page Hawaii." Because HRS § 378–1 (1993) defines "employer" to include agents of persons having one or more employees,[5] the Commission added Teague when it discover-

---

**2.** As this court has accorded persuasive weight to the construction of statutes by administrative agencies charged with overseeing and implementing a particular statutory scheme, we give persuasive weight, in this instance, to the Commissioner's administrative rules that further the purposes of HRS § 386–11. *See, e.g., Aio v. Hamada,* 66 Haw. 401, 406–07, 664 P.2d 727, 731 (1983).

**3.** Employer does not allege that the rule-making procedures set forth in HRS §§ 91–3 and 91–4 (1993) were not followed. Nor does Employer argue that HAR § 12–46–6.1 enlarges, alters, or restricts the provisions of the statute. *See Puana*

*v. Sunn,* 69 Haw. 187, 737 P.2d 867 (1987) (holding administrative rule valid where it was a reasonable regulation that carried out purpose of legislation).

**4.** We further note that the issue regarding the timeliness of the initial complaint has not been raised by Employer.

**5.** HRS § 378–1 provides that " 'Employer' means any person including the State or any of its political subdivisions and any agent of such person, having one or more employees[.]" (Brackets added.)

ed that Teague was an agent of Employer and the individual committing the alleged discriminatory conduct. Therefore, we hold, under HRS § 368–11(c) and HAR § 12–46–6.1, that the amendment of the complaint in this case did not violate the statute of limitations.

## B. *Sex Discrimination*

### 1. *The "No Extended Leave" Policy*

Employer contends that Shaw was terminated because she lied when she applied for the position and that the policy prohibiting any type of extended leave for one year did not have a disparate impact on women.

Article I, section 5 of the Hawai'i Constitution (1978), provides:

*No person shall* be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor *be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of* race, religion, *sex* or ancestry.

(Emphases added.) Hawai'i's Employment Discrimination Law (the statute) was enacted to enforce the constitutional prohibition against sex discrimination in the exercise of a person's civil rights in the employment arena.

As part of the statute, HRS § 378–2(1)(A) provides in relevant part:

It shall be an unlawful discriminatory practice:

(1) Because of race, *sex*, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:

(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

(Emphasis added.) As used in this statute, "[b]ecause of sex" is defined to include "be-

cause of pregnancy, childbirth, or related medical conditions." HRS § 378–1 (1993). This definition was added in 1981 to "clarif[y] and strengthen ... the existing statutory prohibition against employment discrimination because of sex." Sen. Stand. Comm. Rep. No. 1109, in 1981 Senate Journal, at 1363. Indeed,

[p]regnancy and childbirth are, of course, phenomena shared only by women, and only female employees are susceptible to employment losses which may be tied to either. So, if an employer grants employees leave for any and all temporary physical disabilities except pregnancy, and restoration to the employee's former job upon the expiration of leave, it is apparent that women employees are subject to a substantial burden that men need not suffer.

*Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811 (D.C.Cir.1981) (footnotes and internal quotation marks omitted).

To enforce the legislative mandate that employment practices should not penalize pregnant women who work, the Commission has adopted specific rules on pregnancy discrimination. HAR § 12–46–107 (1992) provides in relevant part:

(a) An employer shall not exclude from employment a pregnant female applicant because of her pregnancy.

(b) It is an unlawful discriminatory practice to discharge a female from employment or to penalize her in terms, conditions, and privileges of employment because she requires time away from work for disability due to and resulting from pregnancy, childbirth, or related medical conditions.[6]

(Footnote added.) In addition, HAR § 12–46–108 (1992) provides in relevant part:

(a) Disability due to and resulting from pregnancy, childbirth, or related medical conditions shall be considered by the employer to be justification for a leave, with or without pay, by the female employee for a reasonable period of time. "Reasonable

---

6. Similarly, HAR § 12–46–106 provides in relevant part:

Females shall not be penalized in their terms or conditions of employment because they re-

quire time away from work on account of disability resulting from pregnancy, childbirth, or related medical conditions.

period of time" as used in this section shall be determined by the employee's physician, with regard for the employee's physical condition and the job requirements.

. . . .

(c) A female employee shall be reinstated to her original job or to a position of comparable status and pay, without loss of accumulated service credits and privileges. The employer may request, prior to the employee's return, a medical certificate from the employee's physician attesting to her physical condition and approving her return to work.

In short, the rules prohibit employers from: (a) denying females employment because of pregnancy; (b) penalizing female employees because of pregnancy; and (c) discharging female employees because of pregnancy. The rules further provide for: (a) reasonable leave time required due to pregnancy or childbirth; and (b) reinstatement of a female employee upon her return from leave due to pregnancy or childbirth.[7] It is well recognized that the purpose of these rules is to protect equal job opportunities for women as compared to others by removing a female disability job risk not faced by men and non-pregnant females. *See, e.g., Miller–Wohl Co. v. Commissioner of Labor & Indus.*, 214 Mont. 238, 692 P.2d 1243, 1251 (Mont.1984).

▮ Other jurisdictions that have enacted regulations similar to HAR §§ 12–46–107 and 12–46–108 have held that "no leave" policies similar to Employer's in this case

result in impermissible sex discrimination. For example, in *Miller–Wohl*, the Montana Supreme Court held that a clothing store's no-leave policy created a disparate effect on women who become pregnant, as compared to those employees who do not become pregnant. 692 P.2d at 1252. In so holding, the court applied a Montana statute with language similar to HAR §§ 12–46–107 and 12–46–108.[8] The court found that the employer in *Miller–Wohl*, which was a retail chain of about 290 ladies' wear stores, denied the plaintiff maternity leave because of its practice of denying leave for any disabled employee whose tenure with employer was less than one year. *Id.* at 1250. The court reasoned that, although the employer's policy was facially neutral, its no-leave policy subjected pregnant women to a job termination risk not faced by men. *Id.*

In this case, despite the clear language of HAR § 12–46–108(a) mandating reasonable leave time due to pregnancy or childbirth, Employer denied Shaw any time off for the birth of her child. Although Employer had a "no leave" policy in effect, Employer failed to inform Shaw of this specific policy. According to Shaw, Employer merely asked her for a "one-year commitment." Shaw did not understand this one-year commitment to mean twelve consecutive months of service with no extended leave of any sort.

▮ Notwithstanding the understanding of the parties, however, an employer's policy prohibiting any extended leave for one

---

7. Although Employer does not challenge the validity of these administrative rules, we note that these rules are not preempted by Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act. *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). We further note that these rules are not protectionist legislation favoring one sex above the other. *See, e.g., Miller–Wohl Co. v. Commissioner of Labor & Indus.*, 214 Mont. 238, 692 P.2d 1243, 1253 (Mont.1984).

8. The Montana Maternity Leave Act (MMLA) of 1975 provided in relevant part:

It shall be unlawful for an employer or his agent to: (1) terminate a women's employment because of her pregnancy; [or] (2) refuse to grant to the employee a reasonable leave of absence for such pregnancy[.]

Mont.Code Ann. § 49–2–310, 311 (1983) (brackets added). In applying the MMLA, the Montana Supreme Court noted:

The MMLA is a legislative recognition of changing economic mores in American family life. We are told that in 40% of American households there is a working wife or mother. A growing number of single women support themselves, or themselves and children. In family households the need for two paychecks spreads across the economic spectrum. Even young upwardly-mobile professionals . . ., like a bi-plane, need two wings working to stay aloft. Economic necessity has converged with the growing insistence of women for equal opportunity in all fields to bring about legislative enactments such as the MMLA. The biblical imprecation that the male shall eat his bread by the sweat of his brow has been broadened; Eve is now included.

year contravenes the plain language of HAR § 12–46–108(a). Although Employer did not specifically define what would constitute an extended leave, the evidence adduced demonstrates that Employer would not, for any reason, grant leave time that would extend beyond a few days. While such a short leave may accommodate minor disabilities, it falls considerably short of the period generally recognized in the human experience as the time needed for pregnancy leave.[9] In any event, HAR § 12–46–108(a) clearly and unambiguously requires that an employer grant leave to an employee for "a reasonable period of time" as determined by the employee's physician. Therefore, we hold that Employer's policy denying any extended leave during Shaw's first year of employment violated the plain and unambiguous language of HAR § 12–46–108.[10]

■ Nevertheless, Employer argues that Shaw was terminated because she intentionally failed to disclose her pregnancy before accepting the position. Contrary to Employer's contention, the record indicates that Employer did not directly ask Shaw if she was pregnant. In fact, an employer cannot lawfully ask a job applicant, directly or indirectly, if she is pregnant.[11] Given the law prohibiting employers from asking whether an applicant is pregnant, it follows that an applicant should not be obligated to disclose her pregnancy.

■ Although Employer asserts that Shaw made a one-year commitment knowing that she could not fulfill her commitment, Employer never told Shaw about its "no leave" policy. Shaw could have reasonably believed that a one-year commitment simply meant that she would remain employed with the business for at least a term of one year. Shaw could also have legitimately believed that she would be allowed to take some leave, because she was told that Teague "was a flexible man" and, in accordance with her understanding of the law, that an employee is entitled to maternity leave. Consistent with her understanding of the one-year commitment, the record reflects that Shaw intended to return to work after giving birth. Therefore, Employer has failed to establish a legitimate nondiscriminatory explanation of the adverse employment action.

9. It has been noted that the normal period of pregnancy leave is about six weeks. *See* H.R.Rep. No. 95–948, 95th Cong., 2d Sess. 5 (1978).

10. In *Furukawa v. Honolulu Zoological Society*, 85 Hawai'i 7, 936 P.2d 643 (1997), we summarized the framework for the development of evidence in an employment discrimination case using the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). We noted that, although "a federal court's interpretation of Title VII is not binding on this court's interpretation of civil rights laws adopted by the Hawai'i legislature ... [,] the *McDonnell Douglas* framework can be a useful analytical tool in resolving the elusive factual question of intentional discrimination." *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 (citation and internal quotation marks omitted).

Under the *McDonnell Douglas* framework, a plaintiff has the burden to establish a prima facie case. *Furukawa*, 85 Hawai'i at 12, 936 P.2d at 648. To establish a prima facie case involving discriminatory discharge, the plaintiff must satisfy the following three-part test:

(1) [t]he plaintiff must be a member of a protected class;
(2) the plaintiff must be demonstrably capable of performing his [or her] employment duties; and
(3) the employer, after discharge, sought people with the same qualifications to fill the position.

*Id.* at 13 n. 3, 936 P.2d at 649 n. 3 (noting agreement by the federal circuits) (citations omitted) (brackets added). Once the plaintiff establishes a prima facie case, the defendant must "proffer a legitimate nondiscriminatory explanation of the adverse employment action." *Id.* at 12, 936 P.2d at 648. Thereafter, the plaintiff must demonstrate that the defendant's proffered reasons were "pretextual." *Id.* At all times, the burden of persuasion remains on the plaintiff. *Id.* at 12–13, 936 P.2d at 648–49.

In this case, the Commission's following findings were not clearly erroneous: (1) Shaw was part of a protected class; (2) Shaw was capable of performing the duties of the position; and (3) Employer, after discharging Shaw, sought people with lesser qualifications to fill the position.

11. HRS § 378–2(1)(c) (1993) provides in relevant part:

It shall be an unlawful discriminatory practice because of ... sex ... [f]or any employer ... to make any inquiry in connection with prospective employment, which expresses, directly or indirectly, any limitation, specification, or discrimination[.]

### 2. Bona Fide Occupational Qualification (BFOQ) Defense

▮ Employer next argues that, "even if [Employer] ... had the intention to discriminate against Shaw, its business necessities justified its actions because there were no reasonable accommodations or feasible alternatives to hiring a replacement." (Emphasis omitted.) We disagree.

HRS § 378–3(2) (1993) provides in relevant part:

**Exceptions.** Nothing in this part shall be deemed to ... [p]rohibit or prevent the establishment and maintenance of bona fide occupational qualifications [BFOQ] reasonably necessary to the normal operation of a particular business or enterprise, and that have a substantial relationship to the functions and responsibilities of prospective or continued employment.

(Emphasis in original.) Thus, the language of HRS § 378–3(2) indicates that the BFOQ defense is limited to instances where sex discrimination is: (1) "reasonably necessary" to the "normal operation" of the "particular" business; and (2) "substantially related" to the functions of the position in question.

▮ Based upon the plain language of HRS § 378–3(2) and the legislative history underlying our employment discrimination law discussed above, the statute prohibits the use of general subjective employment standards and mandates BFOQs that are objective and verifiable. Together with the term "occupational," the "substantially related" clause indicates that these objective and verifiable BFOQs must concern job-related skills and aptitudes. By modifying "qualification" with "occupational," the legislature narrowed the BFOQ defense to qualifications that affect an employee's ability to do the job.[12]

Despite the language of the BFOQ defense, Employer argues, in essence, that its small size (two employees) justifies its "no-leave" policy. This contention is inconsistent with our interpretation of the BFOQ defense. Employer's decision to discharge Shaw and subsequent refusal to reinstate her was unrelated to her ability to fulfill the duties of office manager. In fact, at the time Shaw sought reinstatement on October 23, 1992, the record indicates that Shaw, who had mastered seventy-five to eighty percent of the duties of office manager, was more qualified and experienced than either of her subsequent replacements, who had no experience. Because the action taken against Shaw was unrelated to her ability to perform the job, the BFOQ defense is inapposite and does not protect Employer.

Employer also argues that HRS § 378–2(1)(A) should not be applied to two-person employers because it "relegates them (1) to the impossible feat of finding and training an inexperienced temporary worker or (2) the unreasonable obligation of one person performing two jobs for seven weeks." We disagree.

---

**12.** *See Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 200–01, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (interpreting BFOQ defense to Title VII). In *Johnson Controls*, the United States Supreme Court noted:

Under § 703(e)(1) of Title VII, an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1).

....

The wording of the BFOQ defense contains several terms of restriction that indicate that the exception reaches only special situations. The statute thus limits the situations in which discrimination is permissible to "certain instances" where sex discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each one of these terms—certain, normal, particular—prevents the use of general subjective standards and favors an objective, verifiable requirement. *But the most telling term is "occupational"; this indicates that these objective verifiable requirements must concern job-related skills and aptitudes.*

Justice White defines "occupational" as meaning related to a job. [ .... ] According to him, any discriminatory requirement imposed by an employer is "job-related" simply because the employer has chosen to make the requirement a condition of employment. [ .... ] This reading of "occupational" renders the word mere surplusage. "Qualification" by itself would encompass an employer's idiosyncratic requirements. By modifying "qualification" with "occupational," Congress narrowed the term to qualifications that affect an employee's ability to do the job.

(Emphasis added.)

In enacting the employment discrimination law, the legislature intended that all employers, regardless of size, be subjected to its provisions. HRS § 378–1 (1993) provides in relevant part:

> *"Employer" means any person,* including the State or any of its political subdivisions and any agent of such person, *having one or more employee,* but shall not include the United States.

(Emphases added.) Based upon this language, Employer's contention is without merit.

In addition, we note that Employer would not have worsened its position had it reinstated Shaw as required by HAR § 12–46–108. Although Employer cites the "high learning curve" of the position as a justification for its actions against Shaw, both Funari and Wolfert were inexperienced in the area. In contrast, Shaw had mastered seventy-five to eighty percent of the office manager's duties and could have feasibly resumed her duties at the time she sought reinstatement on October 23, 1992. Therefore, we hold that the circuit court correctly upheld the Commission's conclusion that the actions against Shaw were not justified by a BFOQ.

### 3. Damages and the Collateral Source Rule

Employer argues that the circuit court erred by failing to reduce the award of back pay by the amount of unemployment benefits received by Shaw. We disagree.

In this case, the circuit court affirmed the Commission's back pay award of $16,900. This amount represented the amount that Shaw would have earned for the period from October 23, 1992, the date on which she was cleared to return to work, through November 23, 1993, the date on which she was offered and rejected the office manager position by Employer.[13] During this time period, Shaw received $8,322 in unemployment insurance benefits.

Hawai‘i appellate courts have yet to consider the issue of whether a back pay award in an employment discrimination case must be reduced by the amount of unemployment benefits received. The legislative history of our employment discrimination law is also silent on this issue. We are further confronted with a split among jurisdictions that have addressed this matter.

Initially, we note that Hawai‘i's employment discrimination law was enacted to provide victims of employment discrimination the same remedies, under state law, as those provided by Title VII of the Federal Civil Rights Act of 1964. Hse. Stand. Comm. Rep. No. 549, in 1981 House Journal, at 1166; Sen. Stand. Comm. Rep. No. 1109, in 1981 Senate Journal, at 1363. Accordingly, the federal courts' interpretation of Title VII is useful in construing Hawai‘i's employment discrimination law. *See Furukawa,* 85 Hawai‘i at 13, 936 P.2d at 649 (adopting the framework used by federal courts in resolving question of discrimination under HRS ch. 378).

Under the collateral source rule, "a tortfeasor is not entitled to have its liability reduced by benefits received by the plaintiff from a source wholly independent of and collateral to the tortfeasor[.]" *Sato v. Tawata,* 79 Hawai‘i 14, 18, 897 P.2d 941, 945 (1995) (citing 69 A.L.R. 4th § 2(a), at 139 (1989) (footnote omitted) (brackets added)). Numerous federal circuits have applied the collateral source rule in employment discrimination cases to refuse to deduct benefits such as social security and unemployment compensation from back pay awards. *See, e.g., Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1112 (8th Cir.1994) (citation omitted).

Back pay awards in discrimination cases serve two general functions: (1) to make victimized employees whole for the injuries suffered as a result of the past discrimination; and (2) to deter future discrimination. *Id.* at 1113 (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). In *Albemarle,* a Title VII case, the United States Supreme

---

13. Although Shaw earned $1,300 per month as office manager for Employer, the Commission reduced the total award by $400, the amount she earned as a part-time teacher during the applicable time period.

Court emphasized the importance of the deterrence function, noting that

[i]t is the reasonably certain prospect of a back pay award that provide[s] the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.

422 U.S. at 417–18, 95 S.Ct. 2362 (citation and internal quotation marks omitted) (some brackets added and some in original). In this regard, the reduction of a back pay award by unemployment benefits, which are not paid by the employer, "makes it less costly for the employer to wrongfully terminate a protected employee and thus dilutes the prophylactic purposes of a back pay award." *Gaworski,* 17 F.3d at 1113 (citations omitted). In effect, reduction of a back pay award results in a windfall to the employer who committed the illegal discrimination by virtue of a state program designed "to carry out a policy of social betterment for the benefit of the entire state" and not "to discharge any liability or obligation" of the employer. *Id.* (quoting *NLRB v. Gullett Gin,* 340 U.S. 361, 364, 71 S.Ct. 337, 95 L.Ed. 337 (1951)). Although collateral source payments represent additional benefits to Shaw, "as between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer." *Promisel v. First Am. Artificial Flowers,* 943 F.2d 251, 258 (2d Cir. 1991) (quoting *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 795 (3d Cir.1985)).

Based on these considerations, no federal circuit has determined that unemployment benefits should be deducted, as a matter of law, from back pay awards in discrimination cases. *Gaworski,* 17 F.3d at 1113. The federal circuits have split, however, over whether deducting unemployment benefits should be left to the discretion of the trial court. *Id.* A slight majority have held as a matter of law that unemployment benefits should not

be deducted from back pay awards. *See id.* (citing *Craig,* 721 F.2d at 85; *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 627–28 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *Brown v. A.J. Gerrard Mfg. Co.,* 715 F.2d 1549, 1550–51 (11th Cir.1983) (en banc); *EEOC v. Ford Motor Co.,* 688 F.2d 951, 952 (4th Cir.1982); *Kauffman v. Sidereal Corp.,* 695 F.2d 343, 346–47 (9th Cir.1982)).[14]

In *Kauffman,* the United States Court of Appeals for the Ninth Circuit held in a Title VII case that unemployment benefits received by a successful plaintiff were not offsets against a back pay award. 695 F.2d at 347. The Ninth Circuit noted that the only reported decision to set forth reasons in support of deducting unemployment benefits was *EEOC v. Enterprise Ass'n Steamfitters Local 638,* 542 F.2d 579, 591–92 (2d.Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). The Ninth Circuit summarized those reasons as follows:

1) [w]here the contributions to the fund from which the benefits derive are made solely by the defendant, the collateral source rule does not apply; 2)[t]he plaintiff would otherwise receive a double recovery; and 3)[t]he defendant would otherwise in effect be subjected to punitive damages.

*Kauffman,* 695 F.2d at 346 (brackets added). However, the Supreme Court expressly rejected this reasoning in upholding a decision refusing to deduct unemployment benefits from an employee's back pay award for discriminatory discharge. *Id.* In *Gullett Gin, supra,* the Supreme Court reasoned:

To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.

14. *But see Daniel v. Loveridge,* 32 F.3d 1472, 1478 n. 4 (10th Cir.1994); *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1429 (7th Cir.1986) (Posner, J., acknowledging discretion as Seventh

Circuit rule but stating that it "may be unduly favorable to defendants"); *Lussier v. Runyon,* 50 F.3d 1103, 1109 (1st Cir.1995); *Dailey v. Societe Generale,* 108 F.3d 451, 459–61 (2d Cir.1997).

But respondent argues that the benefits paid from the Louisiana Unemployment Compensation Fund were not collateral but direct benefits. With this theory we are unable to agree. Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state[.] We think these facts plainly show the benefits to be collateral.

340 U.S. at 364, 71 S.Ct. 337 (citations omitted) (brackets added).

 Like the Ninth Circuit in *Kauffman,* we are persuaded by the Supreme Court's reasoning in *Gullett Gin* and, therefore, hold, as a matter of law, that unemployment benefits should not be deducted from awards of back pay under our employment discrimination law. Unemployment benefits are collateral source payments that cannot be construed as "partial consideration" for employment.

We further note that our unemployment compensation statute was enacted for the beneficent and humane purpose of relieving the stress of economic insecurity due to unemployment. It should therefore be liberally construed to promote the intended legislative policy. In view of the basic policy of the statute of protecting the worker from the hazard of unemployment, our courts must view with caution any construction which would narrow the coverage of the statute and deprive qualified persons of the benefits thereunder.

*Camara v. Agsalud,* 67 Haw. 212, 216–17, 685 P.2d 794, 797 (1984) (internal citations omitted). Given the purpose of our unemployment compensation law, we believe that no employer should benefit from the state's efforts to provide for an illegally discharged employee. The State has the legal authority, under certain conditions, to recoup unemployment compensation benefits as directed by HRS § 383–44(a) (1993).[15] Although we do not mean to suggest that these conditions exist in this case, our point is that recoupment of state paid benefits should be a remedy that inures to the benefit of the State rather than the discriminating employer. Accordingly, we hold that the circuit court did not have discretion, as a matter of law, to reduce the award of back pay by the amount of unemployment benefits received by Shaw.[16]

## IV. CONCLUSION

For the reasons set forth above, we affirm the circuit court's order affirming the final decision of the Commission.

---

**15.** HRS § 383–44(a) (1993) provides in relevant part:

Any person who has received any amount as benefits under this chapter to which the person was not entitled shall be liable for the amount unless the overpayment was received without fault on the part of the recipient and its recovery would be against equity and good conscience.

**16.** Employer also argues that Shaw failed to mitigate by not seeking "substantially equivalent employment" with pager companies. The final decision of the Commission found that on January 11, 1992, Shaw applied to RAM Paging Hawaii as well as to other telecommunications companies. Based on our review of the record, the Commission's finding is not clearly erroneous.