Concurring and Dissenting Opinion by
RECKTENWALD, C.J.,
in which NAKAYAMA, J., Joins.
Christie Adams applied for a sales position with CDM Media USA, Inc. At the time, she was fifty-nine years old. CDM Media did not hire Adams, and she subsequently filed an age discrimination complaint under Hawaii Revised Statutes (HRS) § 378-2. The circuit court granted summary judgment to CDM Media, and the Intermediate Court of Appeals affirmed.
I agree with the majority that summary judgment should not have been granted to CDM Media, but I respectfully disagree with the majority’s reasoning. The disagreement centers on a seemingly technical question of employment discrimination law: how to apply the second step of the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and adopted by this court in Shoppe v. Gucci Am., Inc., 94 Hawai'i 368, 378, 14 P.3d 1049, 1059 (2000). The framework was established to assist plaintiffs, who often find it difficult to present direct evidence of discrimination, by permitting them to establish a prima facie case of unlawful discrimination with minimal evidence. Further, by requiring the employer to provide specific, non-discriminatory reasons for its actions, which the plaintiff must then disprove, the issues are narrowed and the scope of the plaintiffs potential evidentia-ry search is greatly reduced. However, the framework was never intended to shift the burden of proof to the defendant, which is effectively what the majority’s decision requires.
Moreover, in enacting our employment discrimination law, the legislature prohibited employers from basing their decisions on discriminatory grounds, but otherwise left them with discretion to make employment decisions. The majority’s approach would effectively eliminate that discretion, by ignoring *33 the plain language of the current version of the statute.
The majority’s test would accordingly unsettle what has become a well-established standard both in federal courts and in Hawaii. The McDonnell Douglas framework has never been a means for the employer to escape liability simply by offering a nondiscriminatory reason for its actions, as the majority appears to believe, but is instead intended to “bring the litigants and the court expeditiously and fairly” to the ultimate question of whether the employer intentionally discriminated against the employee. Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The framework has established a careful balance between the sometimes conflicting policies of ensuring that employees have recourse to remedy discriminatory practices, and ensuring that employers have the ability to make business decisions regarding them employees. Thus, as the test has become established over the past forty years in federal courts and seventeen years in Hawai'i, employees, employers, and courts have come to know what is expected of them in employment discrimination cases. Today, however, the majority’s revision of the second step of the McDonnell Douglas framework upsets the careful balance that our precedent has established and unnecessarily creates uncertainty for all parties as to what is required to prove or disprove an employment discrimination claim.
Respectfully, this ease should be resolved using the third step of the McDonnell Douglas framework. Under that step, the question is whether the plaintiff has shown that the employer’s proffered reason is pretextual. As I set forth below, Adams has raised a question of material fact on that issue here, and thus CDM Media’s motion for summary judgment should have been denied.
I. Background
A. Background facts and circuit court proceedings
CDM Media is a Hawai'i corporation that provides global marketing assistance to information technology executives from Fortune 1,000 compames. In January 2009, CDM Media posted an online advertisement for an International Media Sales Executive position. The “requirements” section of the posting stated, “sales experience preferred[,] detail-oriented and organized!,] strong communication skills!,] willingness to take on new challenges!, and] most importantly, a true determination to succeed.”
Adams, who was fifty-nine at the time, applied for the position in February 2009. As a result, Adams had an initial five-minute telephone interview on February 18, 2009, with Brandon Bera, CDM Media’s HR director. After the conversation, Adams emailed Bera her resume, which stated that she had “[m]ore than 20 years of full-time, hands-on experience in nearly all aspects of sales and marketing, including inside and outside sales (award-winning sales rep), public relations, advertising (print, broadcast and online), online research, newswriting, copy-writing, editing (award-winning editor), photojournalism (photo credits in more than 100 newspapers, magazines, newsletters and other publications), news media relations, publicity, promotions, special events productions, etc.”
Under “business experience,” Adams stated that from October 2004 to August 2008, she was a caregiver and home organizer for her mother; from May 2004 to September 2004, she was a loan officer; from September 1998 to November 2003, she was a sales representative for Verizon Information Services (then GTE Directories); and before then she ran her own marketing company. At Verizon, Adams sold advertising in the white and yellow pages, as well as “online advertising, including web sites [ ], links and other advertising products ... to current, new and former customers working in a wide variety of industries!.]” Adams also “presented new and standard advertising products and explained the benefits and features of them to customers in face-to-face meetings or by telephone!.]” Adams’s resume listed numerous performance-based sales awards she won while at Verizon. Bera scheduled an in-person interview with Adams for the following day.
*34 On February 19, 2009, Adams interviewed with Bera at CDM Media’s offices. According to Adams, “[a]t the end of the interview, I asked Bera what the next step would be and he seemed hesitant to pass me along for the next interview. He said Glenn Willis [CEO and president of CDM Media] would decide.” CDM Media decided not to hire Adams, and sent her a letter on March 1, 2009, notifying her of its decision.
On August 27, 2009, Adams filed a charge of discrimination against CDM Media with the Hawaii Civil Rights Commission (HCRC). Upon reviewing Adams’s charge and CDM Media’s answer, the HCRC issued a notice of dismissal and a right to sue letter. On May 10, 2011, Adams filed a complaint against CDM Media in circuit court, alleging age discrimination in violation of HRS § 378-2.[1]
CDM Media filed a motion for summary judgment on February 21, 2012, arguing that Adams could not prove age discrimination under the McDonnell Douglas burden shifting framework.[2] Specifically, CDM Media argued that it had articulated legitimate nondiscriminatory reasons for not hiring Adams under the framework’s second step, and that Adams had failed to proffer evidence that such reasons were pretext for age discrimination under the third step. To articulate CDM Media’s reasons for not hiring Adams, it proffered the declaration of Willis, who stated that he made the decision not to hire Adams for the sales position. According to Willis, “The inside sales person job that Ms. Adams applied for involves cold calling C-Level executives of Fortune 1,000 companies responsible for information technology, can be tedious and requires a team player.” Willis also stated:
It was my belief that the Plaintiff was not qualified for the job because:
a. [S]he had no sales experience in the prior five years;
b. As far as I understood, most of her recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication;
c. As far as I understood, she had little or no sales experience that involved selling to C-Level corporate executives of Fortune 1,000 companies; and
d. I was advised that she had said that she disliked tedious work.
Willis declared that CDM Media “did not hire any younger applicants with equal or lower qualifications for the position.” He also stated that he “was not involved in creating, reviewing or approving any advertising or posting for the position for which [Adams] applied, nor was [he] aware of the content of such advertising or posting, and [he] did not consider any criteria stated in any advertising or posting in making [his] decision” to not hire Adams.
CDM Media argued that Adams made no showing that CDM Media’s decision was motivated by discrimination, or that its stated reasons were unworthy of credence and therefore likely to be pretext. CDM Media further submitted that, “even if the Court believed that CDM Media misjudged Adams’s qualifications, there would be no basis for suspecting age discrimination be *35 cause ‘the employer has discretion to choose among equally qualified candidates.’ ” CDM Media offered no other evidence besides Willis’s declaration, and copies of Adams’s circuit court complaint and a written decision of the Intermediate Court of Appeals in an unrelated matter.
In her opposition, Adams argued that all of CDM Media’s stated reasons for its hiring decision were untrue and therefore “pure pretext.” Attached to Adams’s opposition were her declaration and various exhibits, many of which consisted of unauthenticated screen shots of online articles and purported CDM Media advertisements on third-party websites. In her declaration, Adams stated that she could tell that CDM Media only hired “young” people based on her having looked around the office at her in-person interview, and that those people “did not have the kind of experience represented to be necessary” for the sales job based on her search of their profiles at www.Linkedln. com. Adams also denied that she told Bera she disliked tedious work. In addition to her declaration and the unauthenticated screen shots, Adams also included CDM Media’s answer to her HCRC complaint, which outlined its hiring procedure and included the ages, but not the qualifications, of the people hired instead of Adams. These individuals were twenty-four, twenty-eight, twenty-eight, and thirty-four years old, respectively, at the time of their hiring.
During a hearing on July 5, 2012, the circuit court granted CDM Media’s motion for summary judgment.[3] In explaining its decision, the circuit court noted that Adams had established a prima facie case under the McDonnell Douglas framework, and that CDM Media articulated a legitimate nondiscriminatory reason for its hiring decision, but that Adams then failed to raise triable issues of material fact as to whether or not CDM Media’s reasons were pretextual.
The circuit court issued an order granting CDM Media’s motion for summary judgment, and entered final judgment in favor of CDM Media on July 24, 2012. Adams timely filed a notice of appeal.
B. ICA Appeal
In her opening brief, Adams argued that “CDM [Media] did not meet its initial burden of establishing a legitimate, non-diseriminato-ry justification for not hiring Adams.” Adams also argued that all of CDM Media’s stated reasons were pretext for age discrimination. In particular, Adams argued that (1) Willis’s claim that he made the decision not to hire Adams was inconsistent with CDM Media’s stated hiring process; (2) the factors Willis used to evaluate Adams differed from the published qualifications in the advertisement; (3) the lack of interview notes suggested pretext; (4) Adams was far more qualified than the hirees thus her non-hiring must have been based on age bias; (5) Adams not having been employed for the past five years was pretext; (6) Adams’s lack of inside sales experience was pretext; (7) Adams’s alleged dislike of tedious work was pretext; (8) Willis’s claim that he was not involved in creating the advertising was pretext; and (9) all the grounds expressed by CDM Media were extremely subjective and thereby suggested pretext.
CDM Media’s answering brief stated that CDM Media had articulated several legitimate and nondiseriminatory reasons for not hiring Adams. CDM Media noted that Adams had not presented any direct evidence of discrimination, thus, Adams had to show that CDM Media’s stated reasons were pre-textual. To rebut Adams’s arguments as to pretext, CDM Media contended that even if it considered factors not listed in the advertisement, that fact alone did not raise the inference of discrimination sufficient to overcome summary judgment. CDM Media also stated that an employment decision based upon an honestly held belief, even if mistaken, was legitimate and non-pretextual. Thus, *36 CDM Media argued that even if Adams never said she disliked tedious work, that would not create a dispute of material fact because it did not go to whether or not Willis believed that she disliked tedious work.
In a summary disposition order, the ICA affirmed the circuit court’s order granting CDM Media’s motion for summary judgment. The ICA explained that “CDM [Media] satisfied its burden of proof to rebut Adams’ charge of age discrimination under the pertinent McDonnell Douglas test for age discrimination” by “articulating [the] ‘legitimate, nondiscriminatory reason’ for refusing to hire Adams,” namely, her “lack of recent and relevant work experience in inside sales to high level corporate executives in Fortune 1,000 companies.” The ICA also added that “Adams did not produce persuasive, admissible evidence that CDM [Medians reasons were ‘pretext’ and thus failed to satisfy her burden under McDonnell Douglas.”
II. Standard of Review
A. Summary Judgment
“‘On appeal, the grant or denial of summary judgment is reviewed de novo.’ ” First Ins. Co. of Haw. v. A & B Props., 126 Hawai'i 406, 413, 271 P.3d 1165, 1172 (2012) (quoting Nuuanu Valley Ass’n v. City & Cnty. of Honolulu, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008) (citation omitted)). Furthermore,
[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.
First Ins. Co. of Haw., 126 Hawai'i at 413-14, 271 P.3d at 1172-73.
III. Discussion
HRS § 378-2(l)(A) (Supp.1999) prohibits an employer from discriminating against an individual because of his or her age. HRS § 378-2(l)(A) provides in relevant part that:
It shall be an unlawful discriminatory practice:
(1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:
(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]
In the instant case, Adams is alleging “individual disparate treatment,” i.e., “intentional discrimination against an individual who belongs to a protected class.” See, e.g., Shoppe, 94 Hawai'i at 377-78, 14 P.3d at 1058-59 (footnotes omitted). A plaintiff may attempt to prove individual disparate treatment by adducing direct or circumstantial evidence of discrimination. See id. at 378, 14 P.3d at 1059. Adams offers no direct evidence of age discrimination. She therefore is attempting to prove age discrimination with circumstantial evidence. As this court stated in Shoppe, “When analyzing an individual’s disparate treatment claim that relies on circumstantial evidence of employer discrimination, we have previously applied the burden-shifting analysis set forth by the United States Supreme Court in McDonnell Douglas[.]” Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059.
The McDonnell Douglas framework involves three steps. First, the plaintiff must set forth a prima facie case of discrimination by demonstrating by a preponderance of the evidence:
(1) that plaintiff is a member of a protected class; (2) that plaintiff is qualified for the position for which plaintiff has applied or from which plaintiff has been discharged; (3) that plaintiff has suffered some adverse *37 employment action, such as a discharge; and (4) that the position still exists.[4]
Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059 (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Burdine, 450 U.S. at 253 n. 6, 101 S.Ct. 1089).
“Once the plaintiff establishes a prima fa-cie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiseriminatory reason for the adverse employment action.” Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059 (emphases added) (citing McDonnell Douglas, 411 U.S. at 802-03, 93 S.Ct. 1817). “Finally, if the employer rebuts the prima facie case, the burden reverts to the plaintiff to demonstrate that the defendant’s proffered reasons were ‘pretextual.’” Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060. “If the plaintiff establishes that defendant’s proffered reasons were pretextual, the trier of fact may, but is not required to, find for the plaintiff.” Id.
Although the burden of production shifts under the McDonnell Douglas framework, “[a]t all times, the burden of persuasion remains on the plaintiff.” Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060 (citing Sam Teague, Ltd. v. Hawai‘i Civil Rights Comm’n, 89 Hawai'i 269, 279 n. 10, 971 P.2d 1104, 1114 n. 10 (1999)).
The circuit court granted summary judgment in favor of CDM Media after concluding that (1) Adams set forth a prima facie ease; (2) CDM Media rebutted the prima facie ease by satisfying its burden of production of articulating a legitimate nondiscriminatory reason for its hiring decision; and (3) Adams failed to show that the employer’s reason was pretext for discrimination. Because the briefs submitted to this court do not challenge the circuit court’s determination that Adams made out a prima facie case under the first step of this analysis,[5]1 focus on the second and third steps under the McDonnell Douglas framework.
A. The employer met its burden of production to articulate a legitimate nondiscriminatory reason for its hiring decision
Adams contends the circuit court erred in granting summary judgment on her claim for age discrimination because “CDM [Media] failed to meet its initial burden of establishing a legitimate non-diseriminatory justification for not hiring Adams.”
Under the second step of the McDonnell Douglas framework adopted by this court, “[o]nee the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiseriminatory reason for the adverse employment action.” Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059 (emphases added) (citing McDonnell Douglas, 411 U.S. at 802-03, 93 S.Ct. 1817). As Shoppe makes clear, this is a burden of production and not a burden of proof. See, e.g., Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 958 (8th Cir.1995). Moreover, “[t]he defendant’s burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason *38 for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge.” Woodson v. Scott Paper Co., 109 F.3d 913, 920 n. 2 (3d Cir.1997) (emphasis added).
In Burdine, the United States Supreme Court clarified that the employer’s burden is essentially one of producing an explanation for its hiring decision. According to Bur-dine, which Shoppe cited when adopting the McDonnell Douglas framework, see Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059,
The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondis-eriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant’s evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiffs rejection.
450 U.S. at 254-55, 101 S.Ct. 1089 (emphasis added).
The Burdine Court further explained that “[a]n articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel.” Id. at 255 n. 9, 101 S.Ct. 1089. Stated otherwise, an employer satisfies this second step through admissible evidence of the employer’s reasons for its decision, such as a declaration or affidavit of the decision maker stating why he or she made the employment decision at issue.
In St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the United States Supreme Court further clarified that, under this second step, “the McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of ‘producing evidence’ that the adverse employment actions were taken ‘for a legitimate, nondiscriminatory reason.’” (Quoting Burdine, 450 U.S. at 254, 101 S.Ct. 1089). Under this second step, the employer’s reason must be taken as true because the burden on the employer is one of production, not proof. Hicks, 509 U.S. at 509, 113 S.Ct. 2742. Indeed, “the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment. For the burden-of-production necessarily precedes the credibility-assessment stage.” Id. (emphasis in original).
Our case law is consistent with this burden of producing admissible evidence that articulates a legitimate nondiscriminatory reason for a hiring decision. In Shoppe, this court stated that, “The employer’s explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action.” 94 Hawai'i at 378, 14 P.3d at 1059 (citing Burdine, 450 U.S. at 254-55, 101 S.Ct. 1089) (emphases added). In other words, Shoppe makes plain that the employer’s burden under the second step of the McDonnell Douglas analysis is to produce its explanation for the hiring decision, not to prove or establish that the decision was based on true or correct information. Like Hicks, Shoppe states that an employer’s preferred reason must be taken as true because the burden at this stage is one of production, not proof. See Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059.
Given the above, it is clear that Adams misconstrues the employer’s burden under the second step as the “burden of establishing a legitimate non-discriminatory justification for not hiring Adams.” (Emphasis added). Even at the hearing on CDM Media’s summary judgment motion, Adams argued that, “We have to present a prima facie ease.... We have presented evidence to show that.... So then the burden shifts to [CDM Media] to prove that they had a legitimate reason.” (Emphasis added). Adams incorrectly contends that CDM Media had the burden to prove that its reasons for not hiring her were legitimate and nondiscriminatory. CDM Media’s burden was merely to *39 articulate legitimate nondiseriminatory reasons for its hiring decision, not to prove the legitimacy of those reasons. Adams’s formulation not only blends the second and third steps of the McDonnell Douglas framework, but more to the point, it disregards the fundamental tenet of the framework, that “[a]t all times, the burden of persuasion remains on the plaintiff.” Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060 (citing Sam Teague, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10).
Applying these well-established principles to the instant case, CDM Media satisfied its burden of articulating a legitimate nondis-eriminatory reason for its hiring decision. CDM Media introduced the declaration of the purported decision maker, Willis, who stated that he chose not to hire Adams because he “was advised that she had said that she disliked tedious work.” Willis also stated that other reasons motivated his decision not to hire Adams, i.e., that “she had no sales experience in the prior five years,” he understood she had little or no experience selling to C-Level corporate executives of Fortune 1,000 companies, and that he believed most of her sales experience in the previous 10-15 years was outside sales related to publishing or selling phone book advertising space. Consistent with Shoppe ⅛ second step analysis, the Willis declaration was admissible as evidence of CDM Media’s reasoning for not hiring Adams. 94 Hawai'i at 378, 14 P.3d at 1059 (“The employer’s explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action.”); see also Hicks, 509 U.S. at 516, 113 S.Ct. 2742. Under the second step of the McDonnell Douglas framework, CDM Media met its burden to produce evidence articulating a legitimate, non-discriminatory explanation for not hiring Adams.
Respectfully, in concluding that CDM Media failed to articulate a legitimate, nondis-eriminatory reason for its hiring decision, the majority misapplies the relevant version of chapter 378 and misconstrues the second step under McDonnell Douglas.
First, the majority wholly disregards the plain language of the current statute in contending that a legitimate, non-discriminatory reason “must be a reason related to the ‘ability of the individual to perform the work in question.’ ” Majority at 17,346 P.3d at 86. Simply put, this is not what the statute says. Under the plain language of HRS § 378-2:
(a) It shall be an unlawful discriminatory practice:
(1) Because of race, sex including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status if the domestic or sexual violence victim provides notice to the victim’s employer of such status or the employer has actual knowledge of such status:
(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]
HRS § 378-2.
The plain language of HRS § 378-2 unmistakably prohibits discriminatory hiring decisions based on “race, sex including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status[.]” HRS § 378-2. Nowhere in HRS § 378-2 does it say that the hiring decision has to relate directly to the applicant’s qualifications.
Whereas HRS § 378-2 tells the employer what it cannot do, HRS § 378-3 (1993), on the other hand, tells the employer what it can do. Section 378-3 is the “Exceptions” provision to Hawaii’s anti-discrimination statute, and states in relevant part that:
Nothing in this part shall be deemed to:
(1) Repeal or affect any law, ordinance, or government rule having the force and effect of law;
(2) Prohibit or prevent the establishment and maintenance of bona fide occupa *40 tional qualifications reasonably necessary to the normal operation of a particular business or enterprise, and that have a substantial relationship to the functions and responsibilities of prospective or continued employment;
(3) Prohibit or prevent an employer, employment agency, or labor organization from refusing to hire, refer, or discharge any individual for reasons relating to the ability of the individual to perform the work in question;
[[Image here]]
HRS § 378-3 (emphasis added).
The majority reads HRS § 378-3 as an exclusive list of things the employer may do. However, nothing in either section tells the employer that it must limit its hiring decisions to reasons related to the "ability of the individual to perform the work in question.” The majority’s reading is therefore inconsistent with the plain language of the current statute. Leslie v. Bd. of Appeals of Cnty. of Hawai'i, 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006) (“This court’s primary obligation in construing a statute is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.”) (Quotation marks omitted) (citing Franks v. City & Cnty. of Honolulu, 74 Haw. 328, 334, 843 P.2d 668, 671 (1993)).
Having glossed over the plain language of the relevant version of HRS § 378-2, the majority instead heavily relies on the 1963 version and an accompanying 1963 senate committee report, to claim that a legitimate, non-discriminatory reason must be solely related to the ability of the individual to perform the work in question. Majority at 17, 346 P.3d at 86. The 1963 version of HRS § 378-2 reads:
(1) It shall be unlawful employment practice or unlawful discrimination:
(a) For an employer to refuse to hire or employ or to bar or discharge from employment, any individual because of his race, sex, age, religion, color or ancestry, provided that an employer may refuse to hire an individual for good cause relating to the ability of the individual to perform the work in question!)]”
1963 Haw. Sess. Laws Act 180, § 1(a) at 223 (emphasis added).
However, to the extent that the majority interprets this provision as requiring employers to base them decisions solely on an individual’s ability to perform the work in question, the legislature subsequently saw fit to do otherwise. In 1981, the legislature moved the underlined language relating to “the ability of the individual to perform the work in question” from HRS § 378-2 to HRS § 378-3. 1981 Haw. Sess. Laws Act 94, § 2 at 185— 86. The “Exceptions” provision, HRS § 378-3, now provides in relevant part that: Nothing in this part shall be deemed to:
[[Image here]]
(3) Prohibit or prevent an employer, employment agency, or labor organization from refusing to hire, refer, or discharge any individual for reasons relating to the ability of the individual to perform the work in question!)]
HRS § 378-3 (emphasis added).
Now it is evident that this language, upon which the majority so heavily relies, is in fact an exception to the statute. In other words, this language now falls within the provision that exempts certain employer conduct from the operation of the statute. The operative provision of the statute is HRS § 378-2, which prohibits employment actions taken “because of’ certain characteristics of the affected individual. Nothing in the statute requires an employer to base every employment decision solely on the qualifications of the applicant. To the extent that the 1963 version was unclear about the obligations of the employer when hiring, the legislature clarified that in 1981. The current version of HRS § 378-2 simply cannot be read to require that a hiring decision must be related to “the ability of the individual to perform the work in question.” The majority’s contention, that qualifications of the applicant are the sole test for whether a hiring decision is discriminatory, is incorrect.
The majority states that the 1981 changes to the statute do not alter its analysis because there is no indication that the purpose *41 of the statute changed and because the 1981 version of the statute is substantively identical to the 1963 version. Majority at 17-18, 346 P.3d at 86-87. Respectfully, the majority effectively ignores the 1981 changes. Moreover, although the majority explains that the 1981 changes did not change the legislative intent or purpose behind the statute, the analysis proposed here is not based upon a change in legislative purpose, but upon the plain language of the current statute. Even if the majority is correct that the purpose of the current statute remains the same as the 1963 version, our plain reading interpretation of the current statute is consistent with that legislative purpose when viewed in light of the whole legislative history.[6]
The majority suggests that an interpretation of the statutes that allows an employer to decline to hire an individual for a nondiscriminatory reason not relating to his or her ability to perform the work renders the exceptions in HRS § 378-3 superfluous. Majority at 20, 346 P.3d at 89. This is because the majority reads HRS § 378-3 as an exclusive list of things an employer may do, even when the employer has not engaged in discrimination prohibited under HRS § 378-2. However, the plain language of the statute does not indicate that the list is exclusive, and furthermore the language “[n]oth-ing in this part shall be deemed to” suggests that the opposite is true—that the legislature was merely attempting to ensure that a particular group of key rights remained protected without listing every possible basis for an adverse employment decision.[7]
The majority next converts the McDonnell Douglas framework from a means of facilitating the proof of claims to a new substantive interpretation of the statute, which is not supported by its plain language. In doing so, the majority would subvert forty-plus years of settled jurisprudence. See, for example, McDonnell Douglas Corp., 411 U.S. 792, 93 S.Ct. 1817, as adopted by this court in Furukawa v. Honolulu Zoological Soc’y., 86 Hawai'i 7, 936 P.2d 643 (1997), Shoppe, and several other cases.
The “shifting burdens of proof set forth in McDonnell Douglas are designed to assure that the plaintiff has his [or her] day in court despite the unavailability of direct evidence.” Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (quotation marks, brackets, and citation omitted). In cases where the employee or applicant has no direct evidence of discrimination, “applying the McDonnell Douglas method allows the plaintiff to proceed with an action with bare bones information and to force the hand of the employer as it *42 must then put forward a reason or risk judgment in favor of the plaintiff.” Ruth I. Major, McDonnell Douglas: The Oft-Misunderstood Method of Proof, Fed. Law., May 2012, at 14, 15. Because employment discrimination oftentimes is not overt, the McDonnell Douglas framework enables plaintiffs “who often have little inside information!;,] ... entry into the courthouse and the opportunity to obtain discovery to determine whether the decision was in fact unlawfully motivated.” Id.
Equally important, however, McDonnell Douglas was never meant to shift the burden of proof onto the employer-defendant once the plaintiff has established his or her prima facie ease. Burdine, 450 U.S. at 253-54, 101 S.Ct. 1089. A prima facie case, in effect, creates a presumption that the employer unlawfully discriminated against the employee. Nevertheless, until now, this court and every federal court has been unequivocal in stating that, “[a]t all times, the burden of persuasion remains on the plaintiff’ under the McDonnell Douglas framework. Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060 (citing Sam Teague, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10); see also Burdine, 450 U.S. at 253, 101 S.Ct. 1089 (“The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.”); Lindemann, Age Discrimination in Employment Law at 612 (“Any legitimate, nondiseriminatory reason will rebut the presumption created by the prima facie case. The burden is not difficult to satisfy, as the employer is not required to prove by a preponderance of the evidence that it actually was motivated by the proffered reasons, but only to articulate those reason(s).”).
The purpose of the second step was to force the employer-defendant to articulate the reason for its hiring decision. This would benefit the plaintiff and the trier of fact “by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.” Burdine, 450 U.S. at 255-56, 101 S.Ct. 1089. However, once the employer carries its burden (a burden of production, not persuasion), then the McDonnell Douglas presumption of discrimination “drops from the case.” Wright v. Southland Corp., 187 F.3d 1287, 1291 (11th Cir.1999). “At this point, the case is placed back into the traditional framework—in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected personal characteristic.” Id.; see also Hicks, 509 U.S. at 507-08, 113 S.Ct. 2742 (“If the defendant carries its burden of production [at the second stage of the McDonnell Douglas framework], the presumption raised by the pilma facie case is rebutted, and ‘drops from the ease.’ The plaintiff then has the full and fair opportunity to demonstrate, through presentation of his [or her] own case and through cross-examination of the defendant’s witnesses, that the proffered reason was not the true reason for the employment decision and that race was. [The Plaintiff] retains that ultimate burden of persuading the trier of fact that [the Plaintiff] has been the victim of intentional discrimination.”) (Quotation marks, brackets, and citations omitted). “The McDonnell Douglas presumption, however, has made the plaintiffs task somewhat easier: The plaintiff now has evidence of the employer’s proffered reasons for the adverse employment action, and can attempt to show that these proffered reasons are a pretext for discrimination.” Wright, 187 F.3d at 1291.
Instead of applying this carefully considered and universally accepted framework, the majority converts the McDonnell Douglas framework from a means of facilitating the proof of claims to a new substantive interpretation of the statute, which is not supported by its plain language. In this regard, despite stating that its evaluation of “legitimacy” under the second step does not transform the burden of production into one of proof, the majority several times implies that the burden of production is in fact a burden of proof. For example, the majority contends that one of CDM Media’s reasons was controverted as a criterion by statements in CDM Media’s solicitation, therefore, the majority concluded that CDM Media did not satisfy its burden to articulate a legitimate, nondiseriminatory reason for declining *43 to hire Adams. Majority at 31-32, 346 P.3d at 100-01. Stated otherwise, despite Hawaii and federal ease law making clear that the employer’s burden under the second step is merely to articulate a legitimate, nondiserim-inatory reason, not prove it, the majority concludes that CDM Media did not- satisfy its burden under the second step because it could not prove that it honestly relied on the reason articulated. As discussed below, it is at the third step of the McDonnell Douglas analysis that the validity of an employer’s reasons can be called into doubt. See Hicks, 509 U.S. at 509, 113 S.Ct. 2742 (“[T]he determination that a defendant has met its burden of production [at the second step of the McDonnell Douglas framework] (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment. For the burden-of-production determination necessarily precedes the credibility-assessment stage.”).
The majority states that if we held that at the second step of the McDonnell Douglas framework the employer’s proffered reasons must be taken as true, we would be essentially reading the word “legitimate” out of the test. Majority at 23, 346 P.3d at 92. However, this is inaccurate. The majority correctly states that when determining whether the employer’s reason is “legitimate,” we must analyze whether it is legally sufficient, which means that, if believed by the trier of fact, it must be sufficient to support a finding that unlawful discrimination was not the cause of the adverse employment action. To do this, we must assume that the proffered evidence is true. Although the majority confusingly states that there is no credibility assessment at this step of the analysis, majority at 23, 346 P.3d at 92, it then suggests that we need not take the employer’s proffered reason as true when evaluating the sufficiency of the evidence proffered by the employer, and concludes that CDM Media did not articulate a legitimate reason because its offered reasons were controverted by other evidence, which appears to be a credibility assessment. Majority at 23, 31-32, 346 P.3d at 92, 100-01.
By concluding that CDM Media did not succeed at the second step because its reasons were controverted by other evidence, the majority blends the second and third step inquiries under McDonnell Douglas despite our clear case law establishing that “the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the plaintiff remains at all times with the plaintiff.” See Shoppe, 94 Hawai'i at 378-79, 14 P.3d at 1059-60. Under the majority’s rule, once the plaintiff establishes its prima facie ease, the burden shifts to the employer-defendant to prove that the reasons for its decision were solely related to the position’s qualifications, communicated to the applicants beforehand, and not based on the employer’s understanding or belief.
It is far from clear how the majority’s test will impact employers in Hawaii. The result of the majority’s test will be, at best, confusion about how an employer can lawfully hire employees and turn down applicants. Take for example the majority’s conclusion that an employer cannot rely on its “understanding” or “belief’ regarding the applicant unless the employer has direct personal knowledge of the factual basis underlying the employer’s belief. Majority at 29-32, 346 P.3d at 98-101. Based on this premise, the majority concludes that several of CDM Media’s stated reasons were inadmissible hearsay because the basis for the information is from an unidentified third person or external source. Majority at 29-32, 346 P.3d at 98-101. These reasons, stated by Willis in his declaration, were:
b. As far as I understood, most of [Adams’s] recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication;
c. As far as I understood, [Adams] had little or no sales experience that involved selling to C-Level corporate executives of Fortune 1,000 compames; and
d. I was advised that [Adams] had said that she disliked tedious work.
As discussed above, CDM Media’s burden of production under the second step of *44 McDonnell Douglas was to articulate its legitimate nondiseriminatory reasoning for its hiring decision. An employer satisfies this second step by admissible evidence of the employer’s reasoning for its decision, such as a declaration or affidavit of the decision maker stating why he or she made the employment decision at issue. See, e.g., Rivera v. City & Cnty. of Denver, 365 F.3d 912, 918 (10th Cir.2004). Willis’s statements were offered for the limited non-hearsay purpose of articulating a reason why he made the decision not to hire Adams and were based on his own personal knowledge as the ultimate decision maker on Adams’s application. Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059; see also Hicks, 509 U.S. at 516, 113 S.Ct. 2742. Contrary to the majority’s contention, Willis’s statements were not offered to prove whether Adams’s sales experience was in outside sales or that she had little to no experience selling to C-level corporate executives, for that is the inquiry under the third step of the McDonnell Douglas test. It is the majority’s erroneous analysis under the second step of the test that leads to its conclusion that Willis’s statements were inadmissable hearsay.
Numerous cases have permitted the defendant-employer to articulate its legitimate nondiseriminatory reason through the affidavit or testimony of the decision maker, even if the decision maker’s reasoning is based on third-party information. See, e.g., Rivera, 365 F.3d at 918 (employer articulated its legitimate nondiseriminatory reason through affidavit of ultimate decision maker, who terminated plaintiff after “he was informed” about plaintiffs poor work performance); McDonald-Cuba v. Santa Fe Protective Servs., Inc., 644 F.3d 1096, 1103 (10th Cir.2011) (employer articulated its reason for firing plaintiff through decision maker’s testimony, that “she learned of’ plaintiff starting rival company).
Indeed, no federal jurisdiction appears to have taken the majority’s position. See, e.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir.2002) (“in judging whether [the employer’s] proffered justifications were ‘false,’ it is not important whether they were objectively false.... Rather, courts ‘only require that an employer honestly believed its reason for its actions, even if its reason is ‘foolish or trivial or even baseless.’ ”); Flores v. Preferred Technical Grp., 182 F.3d 512 (7th Cir.1999) (affirming sum-maiy judgment dismissing race discrimination claim where employer honestly believed that Hispanic employee was leader of disruptive protests during work hours); Tesh v. U.S. Postal Serv., 349 F.3d 1270, 1273 (10th Cir.2003) (“[The employer] reasonably believed that Appellant was dishonest.... Whether that belief was erroneous is irrelevant.”); Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106 (6th Cir.2001) (adopting “honest belief" rule); Sybrandt v. Home Depot, U.S.A., Inc., 560 F.3d 553 (6th Cir.2009) (employee’s claim that his conduct did not violate employer’s policy was irrelevant in light of employer’s honest belief that employee violated that policy). Willis’s statements were thus admissible to articulate CDM Media’s reasoning for not hiring Adams, thereby satisfying CDM Media’s burden of production under the second step of McDonnell Douglas. Far from “weakening the evidentiary standard in this context,” majority at 32, 346 P.3d at 101, this approach is consistent with well-established precedent. In contending that CDM Media’s reasons were inadmissible, the majority overlooks the second step’s focus on revealing the employer’s reasoning for its decision as opposed to requiring the employer to prove the factual basis for that reasoning.
A couple of hypotheticals further illustrate the damage that the majority’s rule could inflict on employee hiring in Hawai'i. Under the approach adopted by the majority, whenever the number of equally qualified applicants exceeds the number of positions, those qualified applicants not hired could have a cause of action for employment discrimination because the only legitimate hiring consideration is whether the person is qualified. This is not only unworkable in practice, it also conflicts with the legislative history quoted by the majority, which stated that “the employer may, depending on the job, consider the training, experience, intelligence, personality and appearance of the applicant[.]” majority at 16, 346 P.3d at 85 (quoting S. Stand. Comm. Rep. No. 573, in *45 1963 Senate Journal, at 866). The majority states that this is not a concern because “an employer may select an employee from a pool of applicants ... by comparing and contrasting job-related qualifications without creating a cause of action.” Majority at 26, 346 P.3d at 96. However, under the majority’s test, a cause of action may still be created if, when choosing between applicants with similar or identical qualifications, the employer bases its decision on something other than a clearly “job-related” qualification, such as an applicant’s personality.
Or, suppose that one applicant among many takes a test to determine who is most qualified and earns the highest score. Then, her test is mistakenly attributed to another person who gets the job. She sues and the employer submits a declaration saying, “I did not hire her for the job because I believed that someone else received the highest score.” Under the majority’s test, she will prevail at summary judgment in establishing discrimination, even though the hiring decision was merely the result of a mistake, rather than unlawful discrimination. See Burdine, 450 U.S. at 259, 101 S.Ct. 1089 (“The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him [or her] to Title VII liability, although this may be probative of whether the employer’s reasons are pretexts for discrimination.”). The majority states that such an exam would probably test qualities related to the ability to perform the work. However, the problem in this hypothetical that is not addressed by the majority is how its conclusion in this case—that Willis’s proffered reasons for not hiring Adams were insufficient because they were just his “belief’—would not lead to a conclusion that is as troubling as this mistaken-test-score hypothetical.
In sum, the majority unnecessarily establishes a new interpretation of the McDonnell Douglas test, and fails to give effect to the plain language of the version of Hawaii’s antidiscrimination statute applicable to Adams’s case and currently in effect. By subverting a test that is at the foundation of federal and Hawai'i employment discrimination law, the majority not only threatens to create great uncertainty and instability within Hawaii’s employment community, it does so without good reason.
B. Genuine issues of material fact exist as to whether CDM Media’s stated reasons were pretext for age discrimination
Under the third step of the McDonnell Douglas framework, if the employer produces evidence which rebuts the prima facie case, the burden reverts to the plaintiff to demonstrate that the defendant’s proffered reasons were pretext for discrimination. Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060. “A plaintiff may establish pretext ‘either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer’s proffered explanation is unworthy of credence.’” Id. (quoting Burdine, 450 U.S. at 256, 101 S.Ct. 1089). Specifically with respect to summary judgment, “[a]t the third stage of the McDonnell Douglas analysis, a plaintiff may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, [ ] circumstantially or directly, or (ii) adducing evidence ... that discrimination was more likely than not a determinative cause of the adverse action.” Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir.2010) (internal quotation marks and ellipses omitted). “The plaintiff can discredit the proffered reasons by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the defendant did not act for the asserted nondiscriminatory reasons.” Id. (internal quotation marks and brackets omitted).
“If the plaintiff establishes that defendant’s proffered reasons were pretextual, the trier of fact may, but is not required to, find for the plaintiff.” Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060 (citing Sam Teague, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10). This is because, “[a]t all times, the burden of persuasion remains on the plaintiff” to prove that the employer’s decision was discrimina *46 tory. Shoppe, 94 Hawai'i at 379, 14 P.3d at 1060 (citing Sam Teague, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10); see also Hicks, 509 U.S. at 518, 113 S.Ct. 2742 (“[T]he ultimate question [is] discrimination vel non.”). Viewing the record in the light most favorable to the nonmovant Adams, as this court is required to do at the summary judgment stage, demonstrates that genuine issues of material fact preclude summary judgment.
The only evidence CDM Media produced to articulate its reasons for not hiring Adams was the declaration of its CEO, Willis. Willis stated that he was the decision maker who decided not to hire Adams because he believed Adams “was not qualified for the job.” Related to this reason, Willis also declared that CDM Media “did not hire any younger applicants with equal or lower qualifications for the position.” Willis thus appeared to believe that Adams was simply unqualified for the inside sales job, which primarily involved making 200 to 250 cold calls a day to sell marketing services to businesses, and thus was not better qualified than those hired for the position.
Willis offered several reasons to explain why he believed Adams was unqualified. According to his declaration:
5. It was my belief that Plaintiff was not qualified for the job because:
a. [S]he had no sales experience in the prior five years;
b. As far as I understood, most of her recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication;
c. As far as I understood, she had little or no sales experience that involved selling to C-Level corporate executives of Fortune 1,000 companies; and
d. I was advised that she had said that she disliked tedious work.
(Emphasis added).
The evidence in the record calls into doubt some of CDM Media’s explanations for why Adams was not qualified for the position. In these circumstances, a reasonable factfinder could rationally find CDM Media’s reason unworthy of credence, and hence infer that CDM Media did not act for the asserted nondiscriminatory reason.
First, Willis explained that Adams was not qualified for the job because “most of her recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication.” However, Adams’s resume states in the very first paragraph that she has “more than 20 years of full-time, hands-on experience in nearly all aspects of sales and marketing, including inside and outside sales (award-winning sales rep)[.]” (Emphasis added). Under “business experience,” Adams’s resume also provided a detailed explanation of her work for Verizon Information Services from 1998 to 2003, which involved sales of “online advertising, including web sites [ ], links and other advertising products ... sold to current, new and former customers working in a wide variety of industries[.]” Adams “[s]et appointments with customers, analyzed current advertising programs, researched industry and market information, prepared presentations for new programs, presented new and standard advertising products and explained the benefits and features of them to customers in face-to-face meetings or by telephone[.]” (Emphasis added). Adams also stated in her declaration that:
in the 10 to 15 years prior to the interview I had sales experience in publishing and/or selling phone book advertising which incorporated outside sales and face to face communications. My sales experience during that time was not only in print, but online, selling websites and links for customers. I had 25 years of computer experience at the time. I also sold print and online advertising full-time in an inside sales position over the phone from September of 1998 to about May of 2000, when our management promoted me into outside sales.
In short, the evidence suggests that Adams had several years of experience with inside sales of web-based marketing services in the ten years prior to her submitting an application with CDM Media.
*47 Adams also submitted evidence that Bera recognized her inside sales experience. On the Adams resume and application letter that CDM Media included with its HCRC answer, Bera handwrote “½ inside ½ outside” next to “Verizon/The Yellow Pages.” It is reasonable to infer from these notes that Bera was aware of Adams’s inside sales experience with Verizon Information Services. Further, given that Willis likely received his information about Adams’s inside sales experience from either her resume and application letter or from Bera, it is unclear how Willis could have come to believe that Adams did not possess the relevant inside sales experience, and, by extension, that she was categorically unqualified for the job.
Additionally, Adams calls into question Willis’s explanation that he believed Adams was unqualified for the job because she told Bera that she disliked tedious work. Adams’s attorney acknowledged that, “if somebody says I don’t like to do tedious work, and it’s cold calling, in a telemarketing room basically, of course that’s going to be a substantial factor in your decision making.” Nevertheless, in her declaration, Adams denied she ever made the tedious work statement. Adams argued that “[vjiewing the evidence in the light most favorable to [her], the court must conclude that the statement was never made.”
CDM Media correctly points out that an employer’s honestly held belief, even if mistaken, does not automatically establish pretext. See also Rivera, 365 F.3d at 924-25 (stating that the court does not ask “whether the employer’s proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs”) (brackets omitted). “In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision.” Id. However, even assuming Willis honestly relied on incorrect information that Adams said she disliked tedious work, as Adams points out, under a “cat’s paw” theory an employer may be liable “where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.” Smith v. Bray, 681 F.3d 888, 897 (7th Cir.2012).
Adams also challenges Willis’s statement that he “was not involved in creating, reviewing or approving any advertising or posting for the position for which [Adams] applied, nor was [he] aware of the content of such advertising or posting, and [he] did not consider any criteria stated in any advertising or posting in making [his] decision[.]” Although Willis’s involvement and awareness of CDM Media’s job advertising is a collateral issue that in and of itself may not be enough to preclude summary judgment, a jury could use the plausibility (or lack thereof) of this statement, and others by Willis concerning his reasons for not hiring Adams, to infer that he “is non-eredible, and should not be believed as to other issues[.]” Jaramillo v. Colorado Judicial Dep’t, 427 F.3d 1303, 1310 (10th Cir.2005); see also Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir.2006) (concluding that “the rejection of some explanations may so undermine the employer’s credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales”). Indeed, according to CDM Media’s HCRC answer, “CDM [Media] ha[d] to be careful in their selection as a start up company” because “[a]t the time of [Adams’s] interview, CDM [Media] had only 12 employees[.]” CDM Media further explained that because it was at “the infant stage of the company,” “every hiring decision that [was] made ha[d] to be met with significant amount of evaluation.” A jury could reasonably find that Willis’s statement, that he was not aware of or involved in the advertising for the position, was not credible in light of CDM Media’s small size and position as a startup, Willis’s claim to have been involved in the decision to not hire Adams, and CDM Media’s assertion that every hiring decision was made carefully and with a “significant amount of evaluation.”
Willis’s other statement—that the “company did not hire any younger applicants with equal or lower qualifications for the position”—could be read as another rationale for not hiring Adams, i.e., CDM Media simply chose more qualified candidates. Adams responds that she was far more qualified than *48 those hired, and thus, CDM Media’s hiring decision had to have been based on age bias. As a general rule, “minor differences between a plaintiffs qualifications and those of a successful applicant are not sufficient to show pretext.” Jaramillo, 427 F.3d at 1308-09. To show pretext, “disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.” Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir.2004) (internal quotation marks omitted), overruled, on other grounds by Feliciano v. City of Miami Beach, 707 F.3d 1244 (11th Cir.2013); see also Bender v. Hecht’s Dep’t Stores, 455 F.3d 612, 627 (6th Cir.2006) (“[I]n the ease in which there is little or no other probative evidence of discrimination, to survive summary-judgment the rejected applicant’s qualifications must be so significantly better than the successful applicant’s qualifications that no reasonable employer would have chosen the latter applicant over the former.”).
While Adams insists that her qualifications were superior to those hired instead of her, she did not offer admissible evidence to support this contention. Indeed, Adams’s attorney never moved the circuit court under Hawai'i Rules of Civil Procedure Rule 56(f) for additional time to seek admissible evidence of the hirees’ qualifications through interrogatories or a request for production of documents. Instead, Adams’s attorney submitted Adams’s declaration that she searched for their qualifications on a third-party website, www.LinkedIn.com. As a result, the circuit court correctly determined that such evidence of the hirees’ qualifications was “not admissible evidence to support [Adams’s] claim that others, who were less experienced or who lacked experience, were hired instead of [Adams] for this position, and who were younger.” Absent such evidence, Adams failed to directly raise a jury question as to CDM Media’s other stated reason, that Adams was not as qualified as those hired.
Nevertheless, under the circumstances of this ease, a genuine issue of fact exists as to this reason because it is so intertwined with CDM Media’s first reason, i.e., that Adams was unqualified. Although the employee generally must raise a triable issue as to each reason offered by the employer, “[i]n some cases, ... a successful attack on part of the employer’s legitimate, non-discriminatory explanation is enough to survive summary judgment even if one or more of the proffered reasons has not been discredited.” Jaramillo, 427 F.3d at 1310. “Something less than total failure of the employer’s defense is sufficient to create a genuine issue of fact when”
(1) the reasons are so intertwined that a showing of pretext as to one raises a genuine question whether the remaining reason is valid; (2) the pretextual character of one explanation is “so fishy and suspicious,” that a jury could “find that the employer (or its decisionmaker) lacks all credibility”; (3) the employer offers a plethora of reasons, and the plaintiff raises substantial doubt about a number of them; (4) the plaintiff discredits each of the employer’s objective explanations, leaving only subjective reasons to justify its decision; or (5) the employer has changed its explanation under circumstances that suggest dishonesty or bad faith.
Id. (citations omitted) (emphasis added).
Here, it is clear that CDM Media’s two stated reasons are intertwined. Because Willis believed Adams was unqualified for the position, it follows that he believed those hired were better qualified than her. Given the relation between these reasons, a factfin-der may rationally disbelieve CDM Media’s second statement if it determines that CDM Media’s first statement is unworthy of credence.[8]
To summarize, CDM Media articulated legitimate nondiscriminatory reasons for not hiring Adams, thus satisfying its burden of production under the second step of the McDonnell Douglas framework. Even if *49 Adams establishes at trial that CDM Media’s stated reasons were unworthy of credence, to prevail she will still have to prove that CDM Media’s decision not to hire her was ultimately motivated by age discrimination. Nevertheless, for the purposes of determining whether or not summary judgment was appropriate, I conclude that Adams has done just enough, and CDM Media has done too little, under the third step of the McDonnell Douglas analysis. Accordingly, Adams raised genuine issues of material fact with respect to her age discrimination claim that preclude summary judgment in favor of CDM Media.
IV. Conclusion
Based on the foregoing reasons, I would vacate the ICA’s November 31, 2013 Judgment on Appeal and the circuit court’s July 24, 2012 Final Judgment, and remand this case to the circuit court for further proceedings consistent with this opinion.

. HRS § 378-2 (Supp.1999) provides in relevant part that:
It shall be an unlawful discriminatory practice: (1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:
(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

. As discussed below, Hawaii has adopted the three-step burden-shifting McDonnell Douglas framework, in which (1) the plaintiff first must establish a prima facie case of discrimination; (2) the employer must then articulate a legitimate, nondiscriminatoiy reason for its employment action; and (3) to prevail, the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was pretext for unlawful discrimination. See, e.g., Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059 (citing McDonnell Douglas, 411 U.S. 792, 93 S.Ct. 1817).

. At the hearing, the court also concluded that CDM Media’s hiring of a fifty-two-year-old in April 2008 for the exact same position was not relevant because the fifty-two-year-old was not in the pool of candidates applying at the same time as Adams. The circuit court also ruled that most of Adams's evidence was inadmissible hearsay, including the unauthenticated screen shots of third-party websites posting purported CDM Media advertisements looking for “youthful, motivated and ambitious people to join our ever expanding sales team.”

4. According to McDonnell Douglas, the fourth step in the prima facie case is not a requirement. The McDonnell Douglas Court explained that "the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.” McDonnell Douglas, 411 U.S. at 802 n. 13, 93 S.Ct. 1817.

. The circuit court correctly concluded that Adams established a prima facie case. Adams showed (1) that she was fifty-nine at the time of CDM Media's hiring decision, and thus a member of a protected class of workers; (2) that she was qualified for the position; (3) that she suffered an adverse employment action in not being hired; and (4) that the position still existed after she was not hired. With regard to the second factor, which was the only factor that CDM Media contested at summary judgment, Adams has shown that she has met the minimum qualifications for the inside sales position. See Barbara T. Lindemann & David D. Kadue, Age Discrimination in Employment Law 132 (2003) ("At the prima facie stage, the plaintiff need only show the minimal objective qualifications for the job.”). The advertisement for the position listed the requirements as “sales experience preferred,” "detail-oriented and organized,” "strong communication skills,” "willingness to take on new challenges,” and "most importantly, a true determination to succeed." Even assuming that sales experience was a requirement and not merely a preference, Adams’s resume evidences her considerable inside sales experience, as discussed more fully in section IV.A. CDM Media does not challenge Adams’s qualifications with respect to the remaining requirements.

. We do not need to refer to the 1963 legislative history in light of the plain language of the current statute, which has superceded the 1963 version. Nevertheless, if we did, a reading of the legislative statements cited to by the majority would not support its view when read in context. For example, the majority selectively reads part of the following legislative statement as proof that qualifications are the “sole test”: “This bill does not give minority group members any special privileges in obtaining employment but afford[s] all persons equal opportunities in employment regardless of race, sex, age, religion, color or ancestry, with the qualifications of the applicants being the sole test in selecting employees.” S. Stand. Comm. Rep. No. 573, in 1963 Senate Journal, at 866 (emphasis added). Yet, when the statement is presented in full, it appears the legislature was addressing concerns that the statute might create special preferences (such as hiring quotas) for minorities.
Although there are parts of the 1963 senate report that reference the qualifications of the applicant, when viewed in context, these appear to be general statements of support for equal opportunity, and not directives to employers to base their hiring decisions solely on an applicant's qualifications. Indeed, the senate report states that, "It is not the intent of this bill to tell an employer whom to hire, but to declare it to be unlawful for an employer to refuse to employ, or to discharge from employment any individual because of race, sex, age, religion, color or ancestry[.]” Id. The senate report further explains, "[N]or is it the intent of this bill to interfere with management or an employer's prerogative to select the best qualified person for any given position in accordance with established occupational qualifications that are applied equally to all persons.” Id.

. I do not suggest that an employer may base an employment decision on a discriminatory reason if the decision does not fall into one of the exceptions enumerated in HRS § 378-3. Instead, I would hold only that if an employer’s decision does not discriminate on any of the bases listed in HRS § 378-2, then neither HRS § 378-2 nor HRS § 378-3 is implicated, and the employer's decision need not fall under one of the HRS § 378-3 exceptions.

. Had CDM Media provided evidence to support its claim that the hirees were better qualified, it still may have been entitled to judgment as a matter of law on this reason even though Adams raised triable issues as to CDM Media's other reason that she was not qualified. For example, even if Adams was qualified, CDM Media could have submitted resumes of hirees to show that they had equal or better qualifications. But CDM Media offered no such evidence to support its bald assertion. In the absence of such evidence, a genuine issue of material fact regarding *49 whether Adams was unqualified, raises a genuine question as to CDM Media’s other reason, that she was less qualified than those hired,